UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE No. 94-CR-00529-MOORE/ELFENBEIN

UNITED STATES OF AMERICA,

v.

ANTHONY LEON DAVIS,

 Defendant.
_____/

## REPORT AND RECOMMENDATION ON SUPERVISED RELEASE VIOLATION

**THIS MATTER** came before the Court for a revocation hearing upon a Petition for Warrant or Summons for Offender Under Supervision (the "Petition"), ECF No. [179], as to Defendant, Anthony Leon Davis ("Defendant").[1]

## I. RELEVANT BACKGROUND

Defendant was convicted on October 27, 1995, of possession of cocaine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1) and was sentenced to 298 months' imprisonment followed by eight years of supervised release. ECF No. [62]. He commenced supervision on June 10, 2016, and was scheduled to terminate supervision on June 9, 2024.

On April 9, 2024, the Court issued a Summons for Defendant based on a Petition from the United States Probation Office ("Probation"), alleging that Defendant violated the requirements of supervised release. *Id.* On May 15, 2024, Defendant appeared before the Court for his initial appearance on the Petition, and the Federal Public Defender was appointed

---

[1] This matter was referred to the undersigned by the Honorable K Michael Moore, United States District Court Judge, to take all necessary and proper action as required by law with respect to any and all violations of Supervised Release as to Defendant, Anthony Leon Davis. *See* ECF No. [185].

1

to represent him. ECF No. [181]. After holding status conferences with the Parties, *see* ECF Nos. [187] and [192], the undersigned conducted the revocation hearing, which is discussed in detail below. *See* ECF No. [199].

The violations alleged in the Petition are as follows:

1. **Violation of Mandatory Condition**, by failing to refrain from violation of the law. On April 10, 2024, the defendant committed the offense of Possession of Cocaine, contrary to Florida Statue 893.13-6a, a felony of the 3rd degree.[2]

2. **Violation of Mandatory Condition**, by failing to refrain from violation of the law. On or about April 10, 2024, the defendant committed the offense of Ran Stop Sign, contrary to Florida Statute 316.123-2A.[3]

3. **Violation of Mandatory Condition**, by unlawfully possessing or using a controlled substance. On or about April 12, 2024, the defendant submitted a urine specimen which tested positive for the presence of cocaine in our local laboratory; and subsequently was confirmed positive by Alere Toxicology Services, Incorporated.

ECF No. [179] at 2.

---

[2] Florida Statute 893.13(6)(a) states:

A person may not be in actual or constructive possession of a controlled substance unless such controlled substance was lawfully obtained from a practitioner or pursuant to a valid prescription or order of a practitioner while acting in the course of his or her professional practice or to be in actual or constructive possession of a controlled substance except as otherwise authorized by this chapter. A person who violates this provision commits a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

[3] Florida Statute 316.123(2)(a) states:

Except when directed to proceed by a police officer or traffic control signal, every driver of a vehicle approaching a stop intersection indicated by a stop sign shall stop at a clearly marked stop line, but if none, before entering the crosswalk on the near side of the intersection or, if none, then at the point nearest the intersecting roadway where the driver has a view of approaching traffic on the intersecting roadway before entering the intersection. After having stopped, the driver shall yield the right-of-way to any vehicle which has entered the intersection from another highway or which is approaching so closely on said highway as to constitute an immediate hazard during the time when the driver is moving across or within the intersection.

## II.     REVOCATION HEARING

All parties, including counsel for the United States, United States Probation Officer Michael Wright, Defendant, and Defendant's counsel, appeared at the hearing prepared to proceed. The Government presented the testimony of Broward Sheriff's Office Detective Brian Czerwonko ("Detective Czerwonko") and United States Probation Officer Michael Wright ("Officer Wright") along with various exhibits. *See* ECF No. [199]. Defendant presented the testimony of Lazaro Daniel ("Investigator Daniel"), an investigator from the Federal Defender's Office, along with an exhibit. *Id.* Following the revocation hearing, the Government moved to dismiss Violations 1 and 2 of the Petition without objection from Probation. *See* ECF No. [202]. As a result, the undersigned recommends the dismissal of Violations 1 and 2, and this Report will only analyze Violation 3, that is, whether the Defendant unlawfully possessed or used a controlled substance consisting of cocaine. To do so, the Court will address the evidence presented by each witness.

### a. Detective Czerwonko

Detective Czerwonko, an officer with the Broward Sheriff's Office, testified that, on April 10, 2024, he and his partner were on patrol in an unmarked police vehicle near NW 27th Avenue in Fort Lauderdale, Florida. *See* ECF No. [206] at 8. He observed a grey SUV fail to completely stop at a stop sign, specifically before the white stop bar. *Id.* at 9. Detective Czerwonko testified he was three to four car lengths away, it was daytime, and he had an unobstructed view. *Id.* at 10. His body-worn camera did not capture the traffic violation, and his vehicle is not equipped with a dashboard camera. *Id.* at 10-11. Detective Czerwonko then conducted a traffic stop. *Id.* at 11.

During the stop, the Defendant was the only person in the vehicle. *Id.* The Government admitted into evidence, without objection, various clips of the available body-worn camera

3

footage. *Id.* at 12; *see generally* Exhibits 1-1E. Detective Czerwonko approached the vehicle and asked the Defendant for his license and registration. *See* ECF No. [206] at 12-13. During this interaction, Detective Czerwonko testified that he was leaning inside the vehicle to see if there were any weapons or contraband. *Id.* at 13. At such time, he testified that he saw a single crack rock in plain view in the coin storage compartment in the driver-side door. *Id.* On cross-examination, he agreed that the Defendant immediately pulled over, did not try to flee, was cooperative and respectful, did not make any furtive movements toward the driver-side door or the center console, and there was no smell of crack cocaine smoke. *Id.* at 37-38. The body-worn camera reveals that, shortly after stopping the Defendant, Detective Czerwonko asked him to step out of his vehicle at which time the Defendant complied and was handcuffed and detained. *See* Exhibit 1, 1:09-1:24. Neither detective read the Defendant his *Miranda* rights at this time. *Id.*

Defense counsel cross-examined Detective Czerwonko extensively about the body-worn camera footage. Although Detective Czerwonko testified that he had never seen the crack rock prior to approaching the vehicle and did not alert his partner about it, his partner, Detective Zachtshinsky, is seen on body-worn camera approaching the open driver-side door and saying: "It's *still* here. The thing is *still* here." *See* Exhibit 1A at 1:14-1:19 (emphasis added); ECF No. [206] at 32 ("Q. And you didn't say anything to your partner, who was standing there, that you had seen crack cocaine, right? A. Yes."). In response, Detective Czerwonko and the Defendant both said: "What?" *Id.* at 1:19-1:22. Detective Zachtshinsky responded to the Defendant by saying, "we'll tell you." *Id.* This occurred after the Defendant had already been removed from the vehicle and placed in handcuffs. *Id.* Detective Czerwonko then proceeded to ask the Defendant about a Cadillac he was allegedly trailing[4] and showed the Defendant a crack rock in the coin

---

[4] During the hearing, he suggested the pattern of following the Cadillac was consistent with drug activity.

4

compartment, *see* Exhibit 1 at 1:24-1:44, and in response, the Defendant stated: "I don't know nothing about that [referring to the crack rock]." *Id.* at 1:45- 1:50.  While in handcuffs but prior to reading him his *Miranda* rights, Detective Czerwonko asked the Defendant: "who else would it be [in relation to the crack rock]?" and "[d]o you use the car?" *Id.* at 1:50-2:10.  The Defendant thereafter responded by saying: "I am under arrest. I have nothing to say." *Id.* at 2:10-2:13.  Detective Czerwonko persisted asking questions, asking "for honesty." *Id.* at 2:17-2:33.  Inexplicably, the Defendant was under arrest and in handcuffs for almost eight minutes and asked multiple questions by Detectives Czerwonko and Zachtshinsky without being read his *Miranda* rights.[5]  *See* Exhibit 1A at 7:56-8:38 (documenting the moment the Defendant was read his *Miranda* rights).  This is true even though the Defendant stated that he had nothing to say shortly after being handcuffed.

During the investigation, Detective Czerwonko learned that "Carmen" rented the vehicle the Defendant was driving from Hertz rental car company.  *See* ECF No. [206] at 39, 54.  On cross-examination, he agreed that he did not conduct any follow-up investigation to obtain the rental car records, made no efforts to obtain a statement from "Carmen," who showed up on scene, and did not look into her arrest history.  *Id.* at 39-40.  It bears noting that the detectives did not find any drugs on the Defendant's person or elsewhere in the vehicle.  *Id.* at 47.

Detective Czerwonko testified that he believed this substance was crack cocaine based on its appearance and his training and experience.  *Id.* at 15.  He also field tested the substance on the scene, and the results were positive for cocaine.  *Id.* at 16.  After Detective Czerwonko informed his partner that the substance tested positive for cocaine, the Defendant spontaneously said: "I smoke every once in a while." *Id.* at 17; Exhibit 1A at 5:04-5:10.

---

[5] Even after the Defendant invoked his *Miranda* rights, Detective Zachtshinsky continued to ask him questions.  *See* Exhibit 1A at 8:55-9:25; 10:45-11:30; 12:00-12:25.

Following the Defendant's arrest, Detective Czerwonko sent the substance to the lab for testing. During the hearing, the Defendant objected to the admission of the lab report without the live testimony of the chemist, citing to *United States v. Frazier*, 26 F.3d 110, 114 (11th Cir. 1994). The Court took the matter under advisement to determine the admissibility of the evidence. Even though the Federal Rules of Evidence do not apply in supervised release revocation hearings, hearsay is not automatically admissible. *Frazier*, 26 F.3d at 114. Indeed, revocation proceedings require "certain minimal due process requirements." *Id.* (citing *Morrissey v. Brewer,* 408 U.S. 471 (1972); *Gagnon v. Scarpelli,* 411 U.S. 778 (1973)). "[I]n deciding whether or not to admit hearsay testimony, the court must balance the defendant's right to confront adverse witnesses against the grounds asserted by the government for denying confrontation." *Id.* (citations omitted). And, courts must only admit reliable hearsay statements. *Id.* (citing *United States v. Stephenson,* 928 F.2d 728, 732 (6th Cir. 1991)). *See also United States v. Hathaway*, No. 08-CR-80077, 2011 WL 5320985, at *2–3 (S.D. Fla. Oct. 18, 2011), *report and recommendation adopted,* No. 08-CR-80077, 2011 WL 5295318 (S.D. Fla. Nov. 3, 2011) ("As to reliability, courts have found that hearsay evidence is reliable where it has been corroborated.").

The Eleventh Circuit has indeed affirmed the decision to admit laboratory reports in a revocation proceeding over a defendant objecting to the lack of live chemist testimony. *See United States v. Reese*, 775 F.3d 1327, 1328 (11th Cir. 2015) (finding no clear error in admission of laboratory tests results through testimony of police officer rather than lab technician during revocation hearing); *United States v. Evans*, 662 F. App'x 681, 683-84 (11th Cir. 2016) (affirming district court's conclusion that the particular proceeding did not mandate the chemist to testify, acknowledging that, given their workload, it would be impractical to schedule chemists to testify as a routine matter and finding that the report constituted reliable hearsay).

At the hearing, the Government argued that (1) the chemist was not called as a witness to streamline the hearing, (2) the report is reliable, and (3) there was corroborating evidence that the substance field tested positive for cocaine. *See* ECF No. [206] at 22-24.  As explained in *Evans*, requiring chemists to offer live testimony in every case "would mean ignoring the principle permitting admission of reliable hearsay evidence in a revocation proceeding." *Id.*  Here, the Government did not bring in the chemist for the purpose of streamlining the revocation proceeding. The reliability of the laboratory report is not in question.  There is no assertion that the substance was improperly handled or that the report was compiled in an unusual manner.  Detective Czerwonko testified that he received the report from the crime laboratory via email in the usual manner in which he receives such reports. *Id.* at 26-27.  Further, Detective Czerwonko's field test, finding the substance positive for cocaine, is consistent with the finding in the laboratory report and such corroborative evidence increases its reliability.  As a result, the Court finds that, on balance, the report is admissible under *Frazier*.

### b. Officer Wright

The Government next called Officer Wright to testify. *See* ECF No. [206] at 56.  Officer Wright supervises offenders who are serving a term of supervised release and, in this role, his responsibilities include drug testing defendants under supervision. *Id.* at 56-57.  The Defendant commenced his supervision on June 10, 2016, but Officer Wright did not begin supervising him until April 2022. *Id.* at 57.  Officer Wright testified that he was not working on April 12, 2024 when the Defendant self-reported to Probation. *Id*.  Specifically, the Defendant reported that he had been arrested, that narcotics were found in the vehicle, and that the vehicle belonged to his girlfriend, and he denied ownership of the narcotics. *Id.* at 58.  Officer Wright learned this

7

information from speaking with Probation Officer Holly Harrison ("Officer Harrison"). *Id.* At such time, Officer Wright instructed Officer Harrison to drug test the Defendant. *Id.*

As part of the routine drug-testing process, Probation establishes a chain of custody for the urine sample. *Id.* at 59. Specifically, the Defendant must fill out a form in which he acknowledges that the urine specimen is his and that the specimen is unadulterated. *Id.* The Defendant must also initial the sticker with a serial number on it, initial the security strip, and seal the specimen cup. *Id.* The probation officer also fills out the chain-of-custody form. *Id.* at 59-60.

When the Government moved the chain-of-custody form into evidence, the Defendant objected under *Frazier*, and the Court took the matter under advisement after hearing from the Parties. This chain-of-custody form contained not only the chain of custody for the urine sample but also the test results from the local laboratory and was offered as Exhibit 5. *Id.* at 60-62. The Government proffered that, much like the report from the chemist discussed above, it did not call each individual involved in the chain of custody for efficiency purposes as it would be cumbersome to call Officer Wright, Officer Harrison, the lab technician, and the confirmation lab technician. *Id.* at 61, 63-64. Officer Wright, as the supervising probation officer, could confirm the identity of the Defendant, the Defendant's photograph on the form, and the Defendant's signature on the form. *Id.* at 64. As to the reliability of the report, Officer Wright testified that the form has a photograph of the Defendant as well as his name and signature. *Id.* The form also bears the name and signature of the officer who took the specimen (Officer Harrison), was filled out by the lab technician, has no indication of any unusual additions or deletions, and does not have any indications of a forgery. *Id.*

Turning to the admissibility of the chain-of-custody form, marked as Exhibit 5, "[s]ummoning witnesses from around the country to testify about routine chain of custody and

8

drug testing procedures would be unduly cumbersome and costly for supervised release hearings." *See Hathaway*, 2011 WL 5320985 at *3 (admitting laboratory urine test results over the defendant's objection even though the testifying probation officer did not collect the sample and the government did not call the lab technicians who tested the samples, finding that the government had good reasons not to call the original probation officer). Under the *Frazier* balancing test, the Court agrees that the Government's proffered reason of producing one witness to testify about Exhibit 5 rather than four separate witnesses streamlines the proceeding and avoids imposing undue costs in a revocation hearing. The evidence, of course, must still be reliable and, in this case, the Court indeed finds the chain-of-custody form reliable. As Officer Wright testified, the form included the Defendant's name, photograph, and signature. The Defendant's signature attested that the specimen provided was his own, was not adulterated, and was sealed in his presence, and his signature verified that the specimen number on the form and on the bottle are identical. *See* Exhibit 5. And, as explained below, the national laboratory confirmed the local laboratory's drug test result. Such corroborating evidence adds to the reliability of Exhibit 5. For these reasons, the Court admits Exhibit 5 into evidence.

As it relates to the substance of Exhibit 5, it states that Probation collected a urine specimen from the Defendant on April 12, 2024 at 9:46 a.m. *Id.* at 66, Exhibit 5. In response to a question on the form inquiring whether the Defendant used any illegal narcotics in the last 72 hours, the Defendant responded "no." *Id.* at 67; Exhibit 5. Once the specimen was sealed, it was placed in a security bag and sent to the local laboratory for testing. *See* ECF No. [206] at 68. According to Exhibit 5, the urine specimen tested positive for cocaine at the local laboratory. *Id.*

After it tested positive locally, Officer Wright testified that the substance was sent to a second laboratory in Louisiana, Alere Toxicology Services, Inc. ("Alere"), for confirmatory

testing. *Id.* at 68-69.  Once Alere completed its testing, the report was uploaded into Probation's system. *Id.* at 70.  In this case, the report from Alere, which was marked as Exhibit 6, listed the name of the Defendant ("Anthony Davis"), the name of the collector (Officer "Harrison"), as well as the same specimen number ("B05255754") and PACTS number ("39785") identified on the chain-of-custody form admitted as Exhibit 5.  Over the Defendant's objection under *Frazier*, the Court finds that Exhibit 6 is admissible for the same reasons that Exhibit 5 is admissible.  It would be unduly cumbersome and costly to fly in a lab technician from Louisiana to testify about the laboratory result from Alere at the revocation hearing.  There is no indication that the document lacks reliability.  The document contains numerous identifiers linking the urine specimen to the Defendant, including the Defendant's name, the name of the probation officer who collected the specimen, and a matching specimen number and PACTS number.  In addition, the positive finding for cocaine in Exhibit 5 corroborates the positive finding of cocaine in Exhibit 6.  There was no suggestion at the hearing that the laboratory report was forged or that the urine specimen had been adulterated in any way.

On cross-examination, Officer Wright testified that cocaine stays in the system for about three days.  *See* ECF No. [206] at 76.  He also agreed that Exhibits 5 and 6 do not state how long the cocaine would have been in a person's system, the amount of cocaine in one's system, or how close in time the cocaine may have been ingested in relation to the Defendant's April 10, 2024 arrest.  *Id.* at 78.  Officer Wright also agreed that the Defendant has tested negative for cocaine throughout the two-year period he has supervised him, with the limited exception above, and the Defendant has continued testing negative twice a week since the positive result in April 2024.  *Id.* at 81-83.

### c. Investigator Lazaro Daniel

The Defendant called Investigator Daniel, an investigator for the Office of the Federal Defender, who testified that he subpoenaed the rental records for the subject vehicle from Hertz. *Id.* at 87. According to the rental records, Carmen Miguel rented the vehicle on April 10, 2024 — the same day of the Defendant's arrest — at 12:55 p.m., which was about seven hours before the Defendant's traffic stop. *Id.* at 88; *compare* Exhibit A *with* Exhibit 4. Investigator Daniel also testified that he checked Ms. Miguel's criminal history and determined that she had three drug-related arrests in 2017 and 2018. *See* ECF No. [206] at 88-89. Regarding the June 2017 arrest, he testified that the arresting officer charged Ms. Miguel with possession of heroin discovered in the door handle of the driver-side of the vehicle. *Id.* at 89. However, he does not know if the facts in the arrest affidavit are true and, when asked, he could not confirm whether Ms. Miguel was convicted of the offense. *Id.* at 90-91.

### III. ANALYSIS

In probation revocation hearings, a court must only find that a defendant violated a condition of his supervised release by a preponderance of the evidence, rather than beyond a reasonable doubt. 18 U.S.C. § 3583(e)(3); *see also Johnson v. United States*, 529 U.S. 694, 700 (2000) (noting that, even though such violations can lead to imprisonment, the violation need not be criminal). As the Government has moved to dismiss Violations 1 and 2, *see* ECF No. [202], which relate to the traffic stop and the alleged possession of cocaine during the traffic stop, the Court does not address those violations or any evidence that would be relevant to such violations in its analysis below. Instead, the Court focuses its analysis on the evidence that is germane to Violation 3 — whether, on April 12, 2024, the Defendant submitted a urine specimen that tested positive for cocaine in the local laboratory and in a secondary laboratory, Alere. Based on the

above testimony and evidence and the standard to be applied, the undersigned finds that the Defendant committed Violation 3.

Numerous facts support a finding that the Defendant submitted a urine specimen that tested positive for cocaine. Starting with the evidence at the traffic stop, Detective Czerwonko testified that he found a cocaine rock in the coin compartment of the driver-side door of the vehicle that the Defendant was driving and that had been rented only seven hours earlier. Detective Czerwonko field tested the substance, and it tested positive for cocaine. Body-worn camera footage captured the foregoing evidence. Detective Czerwonko then sent the substance to the laboratory, and it returned positive for cocaine. In addition, Officer Wright testified that cocaine stays within a person's system for three days. Notably, the traffic stop and arrest happened on the evening of April 10, 2024, and the positive urine specimen was provided on the morning of April 12, 2024 — less than 48 hours later. Thus, the timeline of the traffic stop is consistent with the positive test result for cocaine. With that said, the Court recognizes that there were unexplained comments made at the commencement of the traffic stop captured on body-worn camera that suggested Detective Zachtshinsky already knew about the location of the crack rock before they pulled the Defendant over — namely, Detective Zachtshinsky's statement as he approached the open driver-side door saying: "It's *still* here. The thing is *still* here." *See* Exhibit 1A at 1:14-1:19 (emphasis added).

Even if the Court completely ignores the finding of the crack rock in the driver-side door, the positive field test of that crack rock, and the laboratory test confirming the substance was cocaine, as well as the timing of the traffic stop in relation to the urine specimen, the Court finds that the Government has still proven Violation 3 by a preponderance of the evidence. The Government presented evidence that the Defendant self-reported to Probation on April 12, 2024

at which time Officer Harrison required that he provide a urine sample. The Defendant completed the chain-of-custody form in which he attested to the following:

> I certify the information provided by me regarding my last drug use is true and correct. I also certify the specimen I have provided on this date is my own and has not been adulterated. The specimen bottle was sealed in my presence. I have verified that the specimen number on the form and on the specimen bottle are identical.

*See* Exhibit 5. In addition, the Defendant initialed next to the specimen identification number on the chain-of-custody form, initialed the security strip placed on the specimen, and sealed the specimen cup. Officer Harrison then certified that she "collected the specimen identified by the specimen number on this form," that "the numbered labels and security seal were applied to the bottle in the offender's/defendant's presence," and that "the specimen number on the form and bottle are identical." *Id.* The local laboratory results returned positive for cocaine. *Id.* At the hearing, there was no evidence that this urine specimen did not belong to the Defendant or that it was otherwise adulterated. And, there was no evidence that called into question the validity of the test result at the local laboratory.

In addition, to confirm the local laboratory's test results, Probation sent the urine specimen to a second laboratory for confirmation at Alere. Likewise, the report from this laboratory returned a positive test result for cocaine. And, there was no evidence presented at the hearing suggesting that the urine specimen provided to Alere did not belong to the Defendant or had indications of tampering. This laboratory result from Alere corroborates the positive finding at the local laboratory.

In addition, the Court notes that the Defendant made a spontaneous utterance during the traffic stop in which he admitted to occasionally smoking crack cocaine. When Detective Czerwonko told his partner that the crack rock field tested positive for cocaine, the Defendant —

unprompted — stated: "I smoke every once in a while." *See* ECF No. [206] at 17; Exhibit 1A at 5:04-5:10. Unlike other statements elicited on the scene from the Defendant without the benefit of *Miranda* warnings, this admission was not made in response to police questioning and was indeed spontaneous.

The Court acknowledges the Defendant's argument that he had a track record of testing negative for cocaine for years while on supervision. While that may be true (and commendable), that evidence does not negate the Defendant's use of cocaine leading up the April 12, 2024 drug test and the positive test result. Similarly, subsequent negative drug tests while on bond do not disprove the validity of the drug test in question as all subsequent drug tests took place days and weeks later; therefore, any trace of cocaine would have already disappeared from his system.

## IV.     CONCLUSION

Based on the foregoing, I hereby **RECOMMEND** that**:**

1. The Government's Motion for Dismissal of Violations 1 and 2 of the Supervised Release Violation Petition, **ECF No. [202]**, be **GRANTED** and that Violations 1 and 2 be dismissed from the Petition, ECF No. [179];

2. The Court adopt the finding that Defendant violated his conditions of supervised release as alleged in Violation 3 of the Petition, ECF No. [179]; and

3. The Court revoke Defendant's supervised release and hold a sentencing hearing to determine the appropriate disposition.

The Parties will have fourteen days from the date of service of this Report and Recommendation within which to file written objections, if any, for consideration by the United States District Judge. Failure to timely file objections will bar a *de novo* determination by the District Judge of anything in this recommendation and shall constitute a waiver of a

party's "right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions." 11th Cir. R. 3-1 (2016); 28 U.S.C. § 636(b)(1)(C); *see also Harrigan v. Metro-Dade Police Dep't Station #4*, 977 F.3d 1185, 1191-92 (11th Cir. 2020).

**RESPECTFULLY SUBMITTED** in Chambers at Miami, Florida on November 5, 2024.

						_____
						**MARTY FULGUEIRA ELFENBEIN**
						**UNITED STATES MAGISTRATE JUDGE**

Copies to:
Honorable K. Michael Moore
Counsel of Record